[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 561 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 562 
The City of Attalla ("the City") and its mayor and city council appeal from a trial court's judgment requiring them to provide sewer service to certain nonresidents and businesses located in the City's police jurisdiction but outside its corporate limits.
On January 29, 2002, Dean Sausage Company, Inc.; Machine Products Company, Inc.; and Trambeam, Inc. (hereinafter referred to collectively as "the businesses") filed an action requesting a temporary restraining order and a permanent injunction to prevent the City and its mayor and its city council members (hereinafter referred to collectively as "the City defendants") from terminating sewer service to those businesses. The next day the City defendants filed an answer and counterclaim, requesting that the trial court enter an order requiring the businesses to disconnect from the City's sanitary sewer system. The City also filed an objection to the businesses's request for a temporary restraining order. Following a hearing on February 1, 2002, the trial court issued a temporary restraining order enjoining the City defendants from discontinuing sewer services to the businesses.
On April 15, 2002, AAA Plumbing Pottery, Inc. ("AAA"), filed a separate action requesting a temporary restraining order and a permanent injunction to prevent the City defendants from terminating sewer service to AAA. On that same day, the trial court issued a temporary retraining order that prevented the City defendants from terminating sewer service to AAA. The City defendants answered AAA's complaint and counterclaimed for a declaratory judgment that the City defendants owed no duty to provide sewer service in the City's police jurisdiction; the City defendants also requested that the trial court issue an order requiring AAA to disconnect from the City's sewer system. On April 19, 2002, the trial court consolidated the two actions.
All of the parties' claims were tried on June 12 and 13, 2002. Charles O'Rear, the City's mayor, testified at length about the City's sewer problems. O'Rear stated that on February 1, 2002, the City had been *Page 563 
notified by the Alabama Department of Environmental Management ("ADEM") that the City's sewer system had been found to be in violation of the Alabama Water Pollution Act because the system contained more than the maximum permissible amounts of Biochemical Oxygen Demand ("BOD") concentrations and Total Suspended Solids ("TSS") and because the system had had an inordinate amount of sewer overflows. The record reveals that, following ADEM's imposition of fines against the City for those violations, ADEM required the City to enter into a "consent order" to cure all continuing violations of environmental regulations within three years. Under that consent order, the City must change its maintenance and operating procedures, spend $150,000 to install upgrades to the City's sewer-treatment facility, and spend $3,000,000 to upgrade and rehabilitate the sewer lines in the sewer system. Complying with the consent order has forced the City to borrow to its limit; the City does not levy or collect any taxes in its police jurisdiction. O'Rear also stated that those sewer-rehabilitation expenses were incurred only by the City and its residents and that the improvements were being made only to the system inside the City's corporate limits.
O'Rear also described the events leading to the present litigation. When the City engineers determined that most, if not all, of the blood and grease contained in the overflows occurring in many residents' homes was coming from the businesses located in the City's police jurisdiction, the City requested a meeting with business representatives to discuss options for solving the sewer problems. At that meeting in August 2001, O'Rear discussed several lawsuits that had been filed by City residents seeking damages for injuries caused by blood and grease backflows, as well as the ongoing problems caused by AAA and the businesses' use of the City's sewer system; he requested that the businesses consider annexation of their property into the City to help provide funds to pay for a solution to the City's sewer problems. O'Rear stated that the business representatives were very aloof and unconcerned by the City's problems; one representative told O'Rear that if the City needed to fix the sewer, the City should raise the rates paid by its residents, and another representative told the City to "go away and leave us alone."
Garry Shirley, general manager of Dean Sausage Company, Inc. ("Dean"), testified that Dean had been connected to the City's sewer system since 1960 and that Dean employed 120 people at the time of trial. Shirley stated that he did not know what the ADEM regulations regarding TSS and BOD limits required. During questioning by the City defendants' attorney, Shirley categorically denied that Dean put blood or grease refuse into the City's sewer system.
Galen J. Thackston, an environmental consultant who had been hired by Dean approximately six months before the trial to design a wastewater-treatment system for Dean, also testified. In his testimony, Thackston stated that Dean actually discharges substantial amounts of blood and grease into the City's sewer system. Based on Dean's reports to ADEM, Thackston stated that the new treatment system proposed by Dean would reduce the current oil, blood, and grease effluent of 250 parts per million to 60 parts per million. During cross-examination, Thackston testified that part of the proposed treatment plans that included land application would probably not be permitted by ADEM because of the high risk of runoff and overflow into streams and a lake near Dean's facilities.
Testifying for AAA, Shannon Burks, an environmental engineer with Ensor, stated *Page 564 
that he had been hired to upgrade an existing water-treatment system at AAA so as to include wastewater treatment. Although the construction of the system was targeted for completion by October 2002, Burks admitted that the proposed plans had not received state or federal approval.
Michael D. Harris, the president of Machine Products Company, Inc. ("MPC"), testified that MPC had connected to the City's sewer system in the mid-1950s. According to Harris, MPC is a machine and fabrication business that employed 28 workers at the time of trial. During cross-examination, Harris stated that he, Trambeam, Inc., and Metal U.S.A. had contacted an environmental engineer who had informed those businesses that installing a separate wastewater-treatment system would cost between $40,000 to $50,000. Harris stated that it was his decision to pay that amount and to construct such a system rather than agree to annexation of MPC's property into the City because, Harris stated, MPC's employees would pay approximately $11,000 more annually in occupational taxes if annexation occurred.
Bert Miller, vice president of operations for Trambeam, Inc. ("Trambeam"), testified that the company is located directly behind MPC. Trambeam manufactures overhead cranes and employs approximately 24 workers. During cross-examination, Miller stated that he would rather build a separate wastewater-treatment plant costing between $40,000 and $50,000 than have Trambeam's employees pay the City's occupational tax, which, Miller stated, would be required if Trambeam were to be annexed into the City.
Gene Minton, plant manager of AAA, testified that he had worked in the plant since 1983. Minton stated that AAA manufactures porcelain and china sanitary fixtures such as commodes, tanks, lavatories, and urinals. The workforce of the business at time of trial was approximately 240 employees. Minton stated that the average monthly water consumption of the plant was 1,212,275 gallons and its average monthly sewage discharge was 252,658 gallons; he stated that the water that is not discharged as sewage is used in the manufacturing process. Minton attended the meeting in August 2001 when the parties tried to solve the on-going problems with the City's degrading sewer system. After consulting with two environmental engineers, AAA concluded that although the less expensive solution to the sewer problem would be to annex its property into the City, AAA would rather upgrade and build its own system and remain in the City's police jurisdiction.
Randall Wood, the City's superintendent of public works, testified regarding the sewer problems experienced by the City. Wood stated that he had worked for the City since 1992 and had worked exclusively with the wastewater treatment and collection system since 1998. Wood testified that he often had witnessed grease and blood in the effluent discharged by Dean into the City's sewer system and that that effluent was well beyond established BOD and TSS limits.
Allen Waldrup, who was hired by the City to be the project representative for a sewer-rehabilitation project within the City's corporate limits, also testified. Allen Waldrup stated that work on the sewer lines began in March 2002 and was ongoing. He stated that at least two or three times each week blood and grease accompanied by a strong odor would appear in the sewer lines. Allen Waldrup offered pictures he had taken showing that as late as March and April 2002, many of the City's sewer lines were clogged with blood and grease. He opined that the residential backflows were not caused by heavy *Page 565 
rain or infiltration from surface runoff but from overflows of grease and blood from inside the pipes caused by the severe grease deposits that caused blockages in the lines.
Michael Douglas "Doug" Waldrup, a civil engineer who had contracted with the City since 1988 to monitor and develop the City's sewer system, also testified. Doug Waldrup stated that he had witnessed serious grease deposits that also collected other material inside the sewer lines and caused backflows. Doug Waldrup's testimony corroborated Wood's and Allen Waldrup's testimony that the worst BOD problems were coming from the businesses outside the City's corporate limits. Doug Waldrup also testified that he had developed an estimate of the cost of rehabilitating the sewer system in the police jurisdiction alone and that $426,600 was his preliminary cost estimate. He also testified as to particular aspects of the ADEM consent order and its upgrade requirements and the timeframe within which the City would be required to meet the environmental restrictions.
Sharron Jones, the City's clerk, testified for the City defendants. She stated that she had been the City's clerk since 1995 and that the City had never had enough money to cover its sewer expenses. She discussed the figures in the annual audit of the City for the fiscal year ending September 30, 2001. She stated that that audit showed an operating loss of approximately $73,000 for the sewer system.
The trial court requested that all parties file proposed judgment forms. On July 19, 2002, the trial court adopted as its judgment the forms submitted by both AAA and the businesses. Therefore, the trial court's judgment consists of two different orders, both of which were incorporated into the final judgment. Among other items, the trial court issued a permanent injunction prohibiting the City defendants from terminating sewer service to the businesses and AAA. Because the judgment did not address the City defendants' counterclaims, the City defendants requested that the trial court certify the judgment as being final pursuant to Rule 54(b), Ala. R. Civ. P.; this request was granted on July 30, 2002. Thirty days later, the trial court, acting on its own motion, amended its July 19, 2002, judgment so as to deny the City defendants' request for an injunction and for declaratory relief. The City filed its notice of appeal on the same day. The Alabama Supreme Court transferred the case to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
The City alleges that the trial court erred: (1) in holding that the City has a duty to provide sewer service for the health and safety of nonresidents, i.e., those located in the police jurisdiction and not within the City's corporate limits; (2) in allowing the businesses and AAA the option of staying connected to the City's sewer system or building their own sewage-treatment facilities; (3) in holding that the City's adoption of Ordinance 758(01) (terminating sewer service in the police jurisdiction) was arbitrary and capricious; and (4) in denying the City defendants' request for an injunction requiring the businesses and AAA to disconnect from the City's sewer system and their request for declaratory relief.
An appellate court reviews the legislative actions of a municipality in an extremely deferential manner. Municipal legislation, such as Ordinance 758(01), is reviewed to determine if it is "arbitrary or capricious," and is tested by the "fairly debatable" standard. See Homewood Citizens Ass'n v. City ofHomewood, 548 So.2d 142, 143-144 (Ala. 1989); see also AmericanPetroleum Equip. Constr., Inc. v. *Page 566 Fancher, 708 So.2d 129 (Ala. 1997). Moreover, decisions by a trial court granting or denying a permanent injunction are subject to de novo review. See TFT, Inc. v. Warning Sys., Inc.,751 So.2d 1238, 1241 (Ala. 1999).
Police jurisdictions in Alabama are created by statute. See §11-40-10, Ala. Code 1975. "The police jurisdiction in cities having 6,000 or more inhabitants shall cover all adjoining territory within three miles of the corporate limits, and in cities having less than 6,000 inhabitants and in towns, such police jurisdiction shall extend also to the adjoining territory within a mile and a half of the corporate limits of such city or town." Id. This section also gives municipalities the power to enforce all police and sanitary regulations inside the police jurisdiction. While this code section was effectively amended by the adoption of § 11-51-91 (outlining the procedures to follow when municipal police jurisdictions overlap), no general act changing either the size of police jurisdictions or altering municipal authority within such jurisdictions has been adopted. Municipalities have no options regarding the existence of police jurisdictions; they exist as a function of a city's having the minimum population specified in § 11-40-10.
Generally, in order to benefit from municipal services, individuals or businesses must be residents of a municipality. Alabama law allows for three methods through which a city's corporate limits may be extended. See City of Leeds v. Town ofMoody, 294 Ala. 496, 319 So.2d 242 (1975). First, any municipality's corporate limits may be extended by an act of the Alabama Legislature. Second, a municipality's governing body may pass a resolution that certain property be brought within the corporate limits of the municipality by a majority vote of electors living within the boundaries of the property to be annexed. See § 11-42-1 et seq., Ala. Code 1975; see also11-42-40 et seq. for a nearly identical annexation method that contains provisions granting certain tax exemptions with respect to all property annexed by that method. Another method, also known as the "unanimous consent" method, applies when all of the owners of land that is contiguous to the corporate limits of a municipality containing 2,000 inhabitants or more (and that does not lie within the police jurisdiction of any other municipality) sign and file a petition with the city clerk requesting annexation into the municipality, which the city may grant by adopting an ordinance assenting to the proposed annexation. See
§ 11-42-20 et seq., Ala. Code 1975.
Our Legislature has prescribed the powers and duties of municipalities in § 11-45-1, Ala. Code 1975:
 "Municipal corporations may from time to time adopt ordinances and resolutions not inconsistent with the laws of the state to carry into effect or discharge the powers and duties conferred by the applicable provisions of this title and any other applicable provisions of law and to provide for the safety, preserve the health, promote the prosperity and improve the morals, order, comfort and convenience of the inhabitants of the municipality, and may enforce obedience to such ordinances."
(Emphasis added.)
In certain limited situations, nonresidents may benefit from municipal services that are provided within a municipality's police jurisdiction. On occasion, municipal water and sewer service has been extended into a city's police jurisdiction in order to assist the development and growth of a municipality. Other municipal services have been extended into municipal police jurisdictions over the *Page 567 
years at varying costs to Alabama cities; the concept of recouping some of the costs of those services from persons located in those police jurisdictions developed over a period of time. As early as 1917, our Supreme Court held that a municipality in the exercise of its police powers could impose a reasonable license tax on a manufacturing company located in its police jurisdiction and doing business in the municipality. SeeStandard Chem. Oil Co. v. City of Troy, 201 Ala. 89,77 So. 383 (1917).
The seminal United States Supreme Court case discussing the provision of municipal services in police jurisdictions and the propriety of recouping the costs of those services is Holt CivicClub v. City of Tuscaloosa, 439 U.S. 60, 99 S.Ct. 383,58 L.Ed.2d 292 (1978). Writing for the court's majority, then Justice Rehnquist stated:
 "[S]tate legislatures have a legitimate interest in seeing that [residents of unincorporated areas do] not go without basic municipal services such as police, fire, and health protection. Established cities are experienced in the delivery of such services, and the incremental cost of extending the city's responsibility in these areas to surrounding environs may be substantially less than the expense of establishing wholly new service organizations."
Holt Civic Club, 439 U.S. at 74, 99 S.Ct. 383. That decision validated Alabama's statutory limitation on fees collected from persons in municipal police jurisdictions to one-half of the same fees levied within a city's corporate limits. See also StateDep't of Revenue v. Taft Coal Sales and Assocs., 801 So.2d 838
(Ala.Civ.App. 2001) (a city may impose a nonregulatory use tax in its police jurisdiction and the city need not relate the moneys collected to the provision of specific services within the police jurisdiction); Ex parte City of Tuscaloosa, 757 So.2d 1182
(Ala. 1999) (a business located in a city's police jurisdiction had duty to pay a municipal license tax).
Existing side by side with those cases detailing the method of recouping the cost of municipal services in police jurisdictions is a line of cases discussing municipal provision of services generally. Among the more important recent decisions in this line of cases are State Department of Revenue v. Reynolds MetalsCo., 541 So.2d 524 (Ala. 1988), and City of Prattville v.Joyner, 698 So.2d 122 (Ala. 1997) ("Joyner II").[1] InReynolds Metals, our Supreme Court established the principle that municipal regulatory taxes levied and collected within a police jurisdiction pursuant to § 11-45-1 are valid so long as they do not exceed one-half the tax or fee charged to similar businesses within a city's corporate limits and they are reasonably related to the provision of municipal services to persons in the police jurisdiction.[2] In Joyner II, our Supreme Court reaffirmed the holding in Reynolds Metals and concluded that any municipal ordinance levying a license fee on persons in a police jurisdiction that was limited to one-half the fee charged to residents within a city's corporate limits would be presumed reasonable. Reviewing the facts of this case in light of Joyner II, we conclude that trial court erred when it found that the *Page 568 
City had a duty to provide sewer service in its police jurisdiction.
AAA cites Reynolds Metals for the proposition that a municipality has a duty to provide municipal services in its police jurisdiction. This is an incorrect statement of Alabama law. In Joyner II, Justice Houston, the author of ReynoldsMetals, wrote specially to clarify his position on that issue:
 "If a municipality collects taxes from the businesses within its police jurisdiction, that municipality must provide within the police jurisdiction services that cost the municipality the amount of the tax collected there. Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). I referred to this as a duty in the majority opinion in State Department of Revenue v. Reynolds Metals Co., 541 So.2d 524 (Ala. 1988), where I was primarily expressing how a municipality's obligation to provide such services could be fulfilled. 541 So.2d at 531. If a municipality is providing within the police jurisdiction services the cost of which exceeds the amount of taxes collected there, then I believe the municipality has the right to curtail those services that the governing body of the municipality in its reasonable discretion elects to curtail."
Joyner II, 698 So.2d at 127 (Houston, J., concurring specially) (emphasis added). Joyner II ultimately held that a municipality may provide services to and collect taxes from residents of its police jurisdiction so long as the funding principles set out inReynolds Metals are applied. Conversely, Joyner II implies that a municipality is not required to provide any specific services to persons in its police jurisdiction so long as no taxes are collected from persons in the police jurisdiction. That proposition also derives support from Board of Water SewerCommissioners of Mobile v. Yarbrough, 662 So.2d 251 (Ala. 1995). In Yarbrough, our Supreme Court expressly held that a municipality did not have a duty to provide a source of water to nonresidents located in its police jurisdiction. "[A]lthough the city may have a duty based on its police powers to provide a source of treated and purified water to its residents, it does not owe such a duty to persons outside the city limits, to whom providing such a service greatly increases its costs."Yarbrough, 662 So.2d at 254.
The evidence in this case clearly shows that no municipal taxes of any kind are collected by the City in its police jurisdiction. The City's provision of municipal services in the police jurisdiction has been gratuitous, subject only to a connection fee and a monthly user fee. Based on those facts and the cases cited above, we conclude that if a municipality has no duty to provide services, such as water service, to nonresidents, it also has no duty to provide sewer service to nonresidents. We conclude that the trial court erred when it determined that the City had a duty to provide municipal sewer service in the police jurisdiction.
Our analysis with respect to the first issue raised by the City defendants leads naturally to the City defendants' third issue — whether Ordinance 758(01) is arbitrary and capricious. We start with the proposition that neither this court nor the trial court may usurp the legislative authority of the City by deciding for the City which services it will provide to nonresidents, i.e., those individuals and businesses located in the City's police jurisdiction. See Yarbrough, supra, and Joyner II, supra.
Thus, we may only review the City's legislative action terminating sewer service in the police jurisdiction to determine *Page 569 
whether that decision was arbitrary and capricious. See Ex parteTrussville City Council, 795 So.2d 725, 727 (Ala. 2001);Homewood Citizens Ass'n v. City of Homewood, 548 So.2d 142,143-144 (Ala. 1989).
The businesses and AAA are all located on property that was formerly part of a federal military facility, Camp Sibert. After being vacated by the federal government, that property was deeded to the City of Gadsden. In 1969, the City of Gadsden conveyed to the City the rights to the sanitary sewer system of the former Camp Sibert, as well as the main fall out sewer-collector line facility. The businesses and AAA are connected to the City's sewer system by virtue of those preexisting sewer lines, all of which are located in the City's police jurisdiction.
In 1983 the City adopted Ordinance 546, pursuant to § 11-45-1
and § 11-50-1, establishing guidelines that all users of the City's sewer system must obey. AAA cites that ordinance,[3]
which requires all residents of the City to connect to the City's sewer system, as evidence that the passage in December 2001 of Ordinance 758(01), terminating sewer service in the City's police jurisdiction, was arbitrary and capricious. We disagree.
Article III, § 4 of Ordinance 546 states, in pertinent part:
 "The owner(s) of all houses, buildings, or properties situated within the City and abutting on any street, alley, or right-of-way in which there is now located or may be located in the future a public sanitary or combined sewer of the City, is hereby required at the owner(s)' expense to install suitable toilet facilities therein, and to connect such facilities directly to the [City's sewer system]. . . ."
(Emphasis added.)
AAA contends that this ordinance requires businesses located in the City's police jurisdiction to connect to the City's sewer system. However, we read the provision to require the owners of all properties located within the City's corporate limits that abut any street, alley, or right-of-way where sewer lines are placed to connect to the City's sewer system. The fact that the City requires its residents to be connected to the City's sewer system does not in any way vitiate the City's decision not to provide sewer service in the City's police jurisdiction as reflected in Ordinance 758(01).
The testimony at trial clearly shows that the City, if it continues to provide sewer service to persons or businesses in its police jurisdiction, will be in an untenable position. Mayor O'Rear testified regarding the recurring backflows of blood and grease into the homes of the City's residents that have given rise to numerous lawsuits asserting damage claims against the City. O'Rear then discussed the ADEM fines and the consent order that required the City to spend over $3,000,000 to upgrade the municipal sewer system. Doug Waldrup, the City's consulting civil engineer, discussed the ADEM consent order at length and anticipated that another $426,000 would have to be spent in the police jurisdiction to begin to combat the problems caused by the businesses' noncompliant effluents that entered the City's system and created backflows and clogs. Sharron Jones, the City's clerk, testified *Page 570 
that since 1995 the City's sewer system had operated at a loss.
The testimony from the City defendants, AAA, and the businesses indicated that at no time did the businesses consider voluntary annexation into the City in order to help the City secure the appropriate tax revenues needed to rehabilitate the sewer system as currently constituted. Eventually, the businesses asked the City to apply for a state or federal environmental grant for rehabilitation of the sewer lines in the police jurisdiction; however, the City rejected that request, believing that its municipal credit and income should be spent on underwriting and retiring the $3,000,000 debt for the sewer upgrades being performed for its residents.
The businesses and AAA seem to argue that because the City has legislative authority under which it may levy certain taxes and fees in the police jurisdiction, the City's possession of that taxing authority requires the City to provide whatever services that nonresidents require. That contention is simply incorrect; pursuant to Ala. Code 1975, § 11-45-1, the City must provide municipal services to its residents, but is not required to provide the same services to nonresidents. See Joyner II,supra, and Yarbrough, supra.
The record is clear that the City has been providing sewer service to the residents of the police jurisdiction for a number of years; however, this service has not been provided pursuant to any agreement or contract, written or oral. The businesses and AAA essentially present an equitable-estoppel argument. Our Supreme Court's decision in Joyner II precludes the application of equitable estoppel in this situation. Quoting State HighwayDepartment v. Headrick Outdoor Advertising, Inc.,594 So.2d 1202, 1204-05, the court in Joyner II stated:
 "`Equitable estoppel is to be applied against a governmentality only with extreme caution or under exceptional circumstances. First Nat'l Bank of Montgomery v. United States, 176 F.Supp. 768
(M.D.Ala. 1959), aff'd, 285 F.2d 123 (5th Cir. 1961); Ex parte Fields, 432 So.2d 1290 (Ala. 1983).
 "`"Under the settled law, equitable estoppel . . . must be predicated upon the conduct, language, or silence of the party against whom it is sought to be invoked. Said conduct, language, or silence must amount to the representation or concealment of a material fact or facts. The representation must be as to the facts and not as to the law. . . .
"`". . . ."
 "`(Emphasis added [in Headrick Outdoor Advertising]). 176 F.Supp. at 772, quoting Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 182, 77 S.Ct. 707, 709, 1 L.Ed.2d 746
(1957).'"
698 So.2d at 126. The underlying rationale of Joyner II is that residents in a municipal police jurisdiction acquire no vested interest or entitlement to the continued provision of municipal services by reliance or estoppel. Thus, any municipal services being provided in a police jurisdiction without a formal contract or agreement "`may be prospectively altered in scope or terminated, after appropriate prior public notice.'" Joyner II, 698 So.2d at 125. Applying those principles in this case, we conclude that equitable estoppel does not apply.
In this case, the City met with the businesses and AAA before passing Ordinance 758(01). Additionally, Ordinance 758(01) contained extension provisions whereby the mayor was empowered to grant employers or other persons affected by the termination of sewer service in the *Page 571 
police jurisdiction good-faith extensions of up to 30 days, with no limit as to the number of extensions that could be granted at the mayor's discretion. The fact that the City recognized that terminating sewer service in the police jurisdiction was a drastic remedy to a grave problem and still provided a means of "phasing in" the effective date of the termination militates against the proposition that the City's adoption of the ordinance was arbitrary and capricious. We conclude that in light of the evidence of record that showed that the City was faced with a financial catastrophe and that Ordinance 758(01) represented a reasonable (if desperate) measure to alleviate an overburdened sewer system, the trial court erred when it determined that the City's adoption of Ordinance 758(01) was arbitrary and capricious.
The City defendants, in their second issue, challenge those portions of the trial court's judgment giving the businesses and AAA the authority to decide for themselves whether to remain on the City's sewer system or to build their own private sewage-treatment facilities. Our review of the trial court's judgment pertinent to that issue has revealed contradictory provisions in that judgment that, on the one hand, grant the businesses and AAA a permanent injunction preventing the City defendants from disconnecting them from the City's sewer system and, on the other hand, allow the businesses and AAA the option of building their own sewer-treatment facilities if they decide that the City's sewer rates are "unreasonable." Section11-50-121, Ala. Code 1975, establishes the manner by which a municipality may determine sewer rates; Section 11-48-14 et seq., Ala. Code 1975, establishes the method by which a municipality may assess amounts for sewer construction and repair. In contrast, the trial court's judgment effectively attempts to instruct the City how to set "reasonable" sewer rates; to that extent, the trial court's judgment is an impermissible nullification of those acts of the Alabama Legislature that govern municipal funding for sewer construction and maintenance.
In addition, the judgment purportedly grants the businesses and AAA the authority to build their own sewer-treatment facilities as they see fit. While the trial court may have concluded that the businesses and AAA would indeed need to find an alternative to the City's sewer system if City sewer service was no longer provided to the businesses and AAA, the trial court did not have the power to preemptively endorse unbuilt potential sewer systems; such systems must meet state and federal environmental guidelines in order to receive operating permits. Furthermore, there was evidence that some of the alternative systems proposed by the businesses and AAA could constitute nuisances if their wastewater runoff and odors are allowed to enter the City. Under the Alabama statutory provision establishing general municipal police powers, Ala. Code 1975, § 11-45-1, the City may bring actions to restrain operations that create a public nuisance or interfere with the public health and safety, remedies that the City may need to employ in order to prevent harm to its citizens and its property from sewage flowing from AAA and the businesses that is untreated or improperly treated. The judgment's provisions attempting to "pre-approve" the individual sewage treatment systems that may be built by the businesses and AAA impermissibly encroach upon the City's police power, and the trial court is instructed to vacate them on remand.
The final issue on appeal concerns the denial of the City defendants' request for a declaratory judgment that the City owes persons in the police jurisdiction no *Page 572 
duty to provide gratuitous sewer service, and the denial of the City defendants' request for an injunction requiring the businesses and AAA to disconnect from the City's sewer system. In addressing the three other issues raised here, we have outlined the applicable Alabama cases and statutes concerning the duties of municipalities in regard to their police jurisdictions; there simply is no duty imposed on Alabama cities to provide municipal services to nonresidents when no taxes are collected in the police jurisdiction. See Reynolds Metals, supra, and JoynerII, supra. Based on those authorities, we conclude that the City defendants may discontinue gratuitous sewer service in the City's police jurisdiction and that the trial court erred in ruling to the contrary when it denied the City defendants' requested relief.
Based on the foregoing facts and authorities, we conclude that the trial court's judgment in favor of the businesses and AAA was erroneous. We reverse the trial court's judgment and remand the case for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and CRAWLEY and THOMPSON, JJ., concur.
MURDOCK, J., dissents.
[1] Joyner II overruled City of Prattville v. Joyner,661 So.2d 1158 (Ala. 1995), the opinion issued in the first appeal in that case.
[2] In State Department of Revenue v. Taft Coal Sales Associates, Inc., supra, this court upheld the imposition of a municipal use tax levied pursuant to § 11-51-206, Ala. Code 1975.See also City of Hoover v. Oliver Wright Motors, Inc.,730 So.2d 608 (Ala. 1999).
[3] AAA also cites Ordinance 60, adopted in October 1928, requiring the building and maintenance of privies or "water closets" within the City's corporate limits and in the police jurisdiction. This ordinance was enacted to prevent surface flow of wastes into the City; nothing in Ordinance 60 requires connection to the City's sewer system.