943 So.2d 527 (2006)
STATE of Louisiana
v.
Richard J. LAVIOLETTE.
No. 06-KA-92.
Court of Appeal of Louisiana, Fifth Circuit.
September 26, 2006.
*528 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Juliet Clark, Douglas Freese, Donald A. Rowan, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Jack E. Truitt, Melissa S. Quigley, Madisonville, Louisiana, for Defendant/Appellant.
Panel composed of Judges SUSAN M. CHEHARDY, CLARENCE E. McMANUS, and JAMES C. GULOTTA, Judge, Pro Tempore.
*529 JAMES C. GULOTTA, Pro Tempore Judge.
Defendant appeals from his conviction for second degree murder and his sentence to life imprisonment, at hard labor, without benefit of parole, probation or suspension of sentence. We affirm.
On December 5, 2002, the Jefferson Parish Grand Jury issued an indictment charging Defendant with first degree murder, a violation of La. R.S. 14:30. Christopher Arceneaux (Arceneaux) was charged as a co-defendant in the same indictment.[1] Defendant was arraigned on December 9, 2002, and pled not guilty.
On January 27, 2003, defense counsel filed a motion to appoint a sanity commission, alleging Defendant was not competent to stand trial. The trial court granted the motion on January 29, 2003, and appointed a sanity commission. The court held a competency hearing on May 7, 2003. After hearing the testimony of Drs. Richard Richoux and Rafael Salcedo, the court found Defendant was competent to stand trial.
On February 27, 2003, Defendant filed a Motion to Sever Parties on the Basis of Antagonistic Defenses. The trial court granted the motion on June 5, 2003. Defendant filed a Motion to Suppress Statements on January 17, 2003. He filed an Amended Motion to Suppress Statements on January 27, 2003. On September 3, 2003, those motions were heard and denied on September 9, 2003. Defendant applied to this Court for supervisory writs, challenging the trial court's ruling. This Court denied writs. State v. Laviolette, 03-1172, (La.App. 5th Cir.10/30/03).
On April 1, 2004, the State amended the indictment as to Defendant only. The State reduced the charged offense to second degree murder (La. R.S. 14:30.1), and alleged that the murder was committed while Defendant was engaged in the attempted perpetration of an armed robbery. Defendant was arraigned as to the amended indictment on April 6, 2004, and he pled not guilty.
Defendant was tried by a twelve-member jury on April 19, 20, and 21, 2004. The following facts were offered at trial.
Zaina Mansour (Zaina) testified at trial that she is fourteen years old, and she has a brother and a sister who are eight-year-old twins. On the night of October 27, 2002, Zaina and her mother, Deana Mansour (Mrs. Mansour), returned to their home at 804 Huckleberry in Terrytown after a visit with Zaina's grandmother. Mrs. Mansour parked the family's van in the driveway in front of the house, and she and Zaina began cleaning the inside of the vehicle.
Zaina testified that she was standing on the outside of the vehicle on the passenger side, cleaning the back seat. Her mother was standing outside on the vehicle's driver's side. Two young menone black and one whiteapproached Zaina from behind. She testified that the two men were together. The black man grabbed her shoulder and turned her around to face him. He pointed a gun at her face and said, "[G]ive me everything you got." The white man did not say anything, but began rubbing Zaina's thigh with his hand. Zaina testified she believed she was being sexually assaulted, and she was afraid. She called out to her mother.
Mrs. Mansour crawled across the back seat of the van and put her arm around Zaina, shielding the girl with her body. Mrs. Mansour told the men to take everything she had. Zaina testified that her mother tried to move her purse toward the *530 men, offering it to them. But the men did not take anything. Mrs. Mansour said, "Zaina, call the police." The black assailant shot Mrs. Mansour, and both men fled on foot.
Zaina testified that she closed and locked the van doors and began performing CPR on her mother. She tried to call police on a cellular telephone, but the phone was inoperable. Zaina ran to the front door of the house and called to her father for help. Aref Mansour (Mr. Mansour), Zaina's father (and the victim's husband), testified that he was napping inside the house when his daughter knocked on the door. He said Zaina called police, and officers responded quickly. But by the time emergency medical technicians arrived, Mrs. Mansour was dead.
Mr. Mansour testified that police found $1,600 in cash in the van after the murder. He said that Mrs. Mansour worked in her family's business, and she often handled large sums of money.
Dr. Karen Ross, an expert in forensic pathology, testified that she performed an autopsy on the victim's body. She determined the cause of death was a gunshot wound to the chest. The doctor testified that the wound was consistent with the victim turning and shielding someone else.
Deputy Stephanie Bartolo (Deputy Bartolo), a patrol officer with the Jefferson Parish Sheriff's Office, testified the shooting call originated at 8:45 p.m., and it took her about three minutes to arrive at the scene. Another deputy was already there. Deputy Bartolo testified that the victim was in the vehicle, slumped over the seat and bleeding profusely. Zaina, who was standing next to the vehicle, said "Help my mom. Please don't let my mom die." Deputy Bartolo testified that she attempted to administer first aid to the victim. She briefly interviewed Zaina, who described the perpetrators as a white man and a black man.
Lieutenant Grey Thurman (Lieutenant Thurman), a platoon commander with the Homicide Section, testified that his squad was assigned to the investigation. He and Detective Donald Meunier (Detective Meunier) processed the scene at 804 Huckleberry. Lieutenant Thurman testified that he grew up near the scene, and he knew there was little foot traffic from outside the neighborhood. He therefore believed that the perpetrators lived in the neighborhood.
Lieutenant Thurman testified that among the items of evidence recovered at the scene were a spent cartridge casing and a projectile from a nine millimeter semi-automatic handgun. The murder weapon was never recovered. The Mansours' vehicle was impounded, and was processed for evidence at the Detective Bureau. Detective Meunier testified that a palm print found on the rear passenger side of the victim's vehicle was determined to be that of Arceneaux. No fingerprints were found that matched Defendant's.
Detective Meunier testified that the sheriff's department received a number of anonymous telephone calls from people who suggested Defendant was involved in the murder. Using computer databases, Detective Meunier found a photograph of Defendant. Defendant fit Zaina's general description of the second perpetrator as a white or Hispanic man. Detective Meunier testified that, on October 29, 2002, he showed Zaina a photographic lineup containing a picture of Defendant, but Zaina was unable to make identification.
Detective Meunier testified that his suspicions were further piqued by the fact that Defendant lived only three or four houses away from the Mansours. Moreover, the detective learned that Dennis Cloud (Mr. Cloud), an associate of Defendant's, *531 had reported a nine millimeter handgun stolen from his car on October 24, 2002, while the vehicle was parked in front of Defendant's house. Based on the evidence found at the scene, the investigators believed the murder weapon was a nine millimeter handgun.
Deputy Kirk Zeagler (Deputy Zeagler) testified that he and other officers canvassed the Mansours' neighborhood on October 30, 2002, with the hope of uncovering additional information about the perpetrators. Officers went to Defendant's house and spoke with Defendant and his mother. Deputy Zeagler said Defendant's mother denied any knowledge of the murder. Defendant did not say that he had seen either the shooting itself or the perpetrators. The deputy said that Defendant's demeanor suggested he was afraid and he found Defendant's behavior to be inappropriate.
Mr. Cloud testified, as a defense witness, that he has known Defendant for ten years, and that he was a friend of Defendant's older brother, Michael. Prior to the murder, he visited the Laviolette house nearly every day. Mr. Cloud testified that on October 24, 2002, he parked his car in front of Defendant's house during a brief visit. He later noticed the handgun he kept in the car was missing. Mr. Cloud testified that there was not a time during the visit when Defendant could have gotten into his car without being seen. Defendant was in his presence during his entire visit, except when he went to use the bathroom.
Mr. Cloud testified that following the murder, he met with Detective Meunier to inform him about the theft of his gun. Detective Meunier asked Mr. Cloud to help him initiate contact with Defendant. The detective testified that he asked Mr. Cloud to invite Defendant on a social outing. Officers would be stationed at a prearranged location, and they would stop Defendant and Mr. Cloud. In that way, Detective Meunier planned to make contact with Defendant, while ensuring that he would not have an opportunity to "tip off" his co-perpetrator.
The detective testified that he and several other plainclothes detectives waited on Terry Parkway in Terrytown until Mr. Cloud and Defendant approached riding Mr. Cloud's motorcycle. The officers stopped the two men, informed Defendant about the homicide investigation, and asked him to accompany them to the Detective Bureau. When they arrived there, the officers placed Defendant in an interview room. Detective Meunier testified that he advised Defendant of his Miranda[2] rights, and Defendant agreed to waive his rights and submit to a tape recorded interview. The interview began at 4:15 p.m. on November 1, 2002. During that interview, Defendant said he had no involvement in the murder, nor had he witnessed it. The tape recording of the interview was admitted at trial, and was played for the jury. A transcript of that recording was also admitted in evidence.
Defendant submitted to a second tape recorded interview at 5:15 p.m. on November 1, 2002. That interview was also entered into evidence and was played for the jury. During that interview, Defendant admitted to Detective Meunier that he was with Arceneaux on the night of October 27, 2002, and that he saw Arceneaux shoot the victim. Defendant said he did not participate in the shooting. He further claimed he was not standing close to Arceneaux when Arceneaux fired at the victim. Defendant said that afterwards, Arceneaux held the gun to his head and threatened to *532 kill him if he told anyone he was the shooter.
Detective Meunier testified that he arrested Defendant on November 1, 2002. The Detective testified that he showed Zaina photographic lineups containing pictures of Defendant and Arceneaux, but she was unable to make an identification. Zaina did, however, collaborate with Heather Gorman of the sheriff's office to complete a composite drawing of the black suspect.
Timothy Scanlan (Scanlan), a forensic scientist with the Jefferson Parish Sheriff's Office Crime Lab, was accepted by the trial court as an expert in firearms examination. He testified that he examined the projectile and the copper jacket found at the scene. He determined that they were fired from a Hi-Point nine millimeter handgun.
Scanlan testified that he participated in the examination of the victim's vehicle after it was impounded. He dusted it for fingerprints and swabbed it for DNA samples. Lieutenant Patricia Adams (Lieutenant Adams) of the latent fingerprint division testified for the defense. She stated that she assisted in collecting latent fingerprints from the vehicle. She testified that of the four slides lifted, three were palm prints and the other was a fingerprint. Two of the palm prints were identified as Arceneaux's. The fingerprint was identified as belonging to the victim's sister. There was one palm print that could not be identified because it was of poor quality.
Following trial, the jury returned a verdict of guilty as charged. On May 12, 2004, Defendant filed a motion for new trial. The motion was argued and denied on June 2, 2004. Defendant waived statutory delays, and the court sentenced him that day to a mandatory term of life imprisonment, without benefit of parole, probation, or suspension of sentence. Defendant made a timely oral motion for appeal. He filed a written Motion for Appeal on June 22, 2004. The trial judge granted the motion on June 24, 2004. On appeal, Defendant assigns two errors.
ASSIGNMENT OF ERROR NUMBER ONE
By this assignment of error, Defendant argues the trial court erred in allowing the State to call Arceneaux as a witness before the jury when the prosecutors knew he would invoke his Fifth Amendment privilege against self-incrimination. Defendant contends that Arceneaux's assertion of privilege in the presence of the jury prejudiced his case, and thus this Court should vacate his conviction and sentence and grant him a new trial.
The State first argues, as a procedural matter, that defense counsel did not make the required contemporaneous objection to the trial court's ruling allowing Arceneaux to take the stand in the presence of the jury. On the merits, the State argues there was no error in calling Arceneaux to the stand, because he had no Fifth Amendment privilege to assert. Moreover, the State argues, that Defendant was not prejudiced in any way by Arceneaux stating that he would "plead the Fifth," in response to the prosecutor's question, "Mr. Arceneaux, how old are you?"
During a break in the trial proceedings, out of the jury's presence, the judge met with prosecution and defense counsel to discuss the State's expressed intention to call Arceneaux to testify. Also present were Lee Faulkner and Paul Fleming, who had represented Arceneaux at his separate trial, and Ben Cohen of the Capital Appeals Project. At that time, Arceneaux had been convicted of first degree murder and the jury in his case had recommended *533 the death penalty, but the trial court had not yet imposed the sentence.[3]
Cohen informed the judge of earlier discussions between the State and Arceneaux's counsel regarding an agreement by which Arceneaux would testify for the State at Defendant's trial. Under said agreement, the State would consent to a sentence of life imprisonment for Arceneaux. Prosecutor Douglas Freese responded that, while the State had offered to discuss such an arrangement with Arceneaux's counsel, the offer had expired at the commencement of Defendant's trial. Freese further explained that the State would be calling Arceneaux to testify under the provisions of La C.Cr.P. art. 439.1.[4]
Mr. Faulkner informed the court that, "since the State has retracted it, there's no deal on the table for Arceneaux to testify and he will invoke his Fifth Amendment privilege and there will be no testimony from Arceneaux on this matter." Freese responded that Arceneaux could not refuse to testify, and that if he attempted to invoke a Fifth Amendment privilege, the judge should inform him that he was required to answer the questions put to him. The judge ruled that the State could call Arceneaux to the stand before the jury.
The jury was called into the courtroom. Before the trial resumed, the following exchange took place at the bench:
MR. WALKER [defendant's counsel]:
Your Honor, out of an abundance of caution, not knowing what's going to come out in front of the jury, I would request that this witness initially be taken out of the presence of the jury to determine whether or not he's going to testify.
MR. FREESE:
No. They don't have a right to a preview of what will happen on the stand. We can call the witness and ask the witness what questions we deem appropriate, regardless of what his response is going to be.
THE COURT:

*534 Do you want to respond?
MS. GAULIN [defendant's co-counsel]:
Under State versus Berry, it would be unethical to put a witness on the stand knowing that he will not testify. It would be very, very prejudicial, for our client, to do that.
MR. FREESE:
That is a misstatement of the law. It would be unethical for me to call a witness who I know would invoke the Fifth Amendment right that he can invoke.
THE COURT:
But the thing is he has no Fifth Amendment right at this point, because
MR. WALKER:
But, Your Honor, my concern is that he's going to refuse to testify, and then Mr. Freese is going to ask him questions knowing that he's not going to answer, and it's going to amount to Mr. Freese testifying through his questions.
THE COURT:
And I won't allow that.
MR. WALKER:
That is what I was concerned about in front of the jury.
THE COURT:
And we're not going to go through a long list of questions. I will allow him to begin, but if that's the tact that's taken, then we'll just have to leave it at that point.
The bench conference ended, and the State called Arceneaux to the stand. Freese asked Defendant, "How old are you?" and Defendant responded, "I respectfully plead the Fifth." Freese then explained to him that he was required to respond to questioning under oath pursuant to the court's order. Arceneaux responded that he understood, but that he would not be testifying.
At that point, the trial judge explained to Defendant that as part of the court order his testimony was compelled and that it could not be used against him in any criminal prosecution except for perjury or giving a false statement. Arceneaux indicated that he understood what the judge was saying but he was still refusing to testify. At that point the trial judge indicated he would take the matter under advisement and excused Arceneaux. Later, the judge ruled that the State would not be permitted to question Arceneaux further.
During the jury's deliberations, jurors submitted some handwritten questions to the judge. The judge ordered the note entered as Court Exhibit 1, and it is included with the exhibits in the appeal record. The fourth and final written question was: "You indicated yesterday that you would take under advisement the refusal to testify by Chris Arceneaux when he cited the [F]ifth [A]mendment and rule on that. Are we allowed to know the result of your ruling? Should we expect to hear it either before or after our deliberations?" To that question, the judge responded that he would address the matter with the jurors after they completed their deliberations. If the judge ever offered the jurors an explanation of his ruling with regard to Arceneaux, it is not included in the record.
Defendant argues on appeal that when the trial court allowed Arceneaux to invoke his Fifth Amendment privilege before the jury, it likely caused jurors to infer that Arceneaux did not want to incriminate Defendant because in doing so he would implicate himself in the murder.
Considering the State's procedural objection, that defense counsel did not preserve this issue for review because he failed to make a contemporaneous objection, we find no merit in it. The purpose of the contemporaneous objection *535 rule is to put the trial judge on notice of an alleged irregularity, allowing him the opportunity to make the proper ruling and correct any claimed prejudice to the defendant. This prevents the defendant from gambling for a favorable verdict at trial and then later utilizing appellate review to correct errors that might easily have been corrected by the trial judge. State v. Williams, 04-608, p. 8 (La.App. 5th Cir.11/30/04), 889 So.2d 1093, 1100, writ denied, 05-0081 (La.4/22/05), 889 So.2d 559.
The Louisiana Supreme Court has said, "There are no formal requirements detailing any specific form for an objection. All that is required is that a party make clear, at the time an order of the court is made or sought, the action which he desires the court to take, together with an objection and grounds." State v. George, 95-0110, p. 13 (La.10/16/95), 661 So.2d 975, 981.
The record herein shows that the defense did voice its opposition when the prosecution announced its intention to question Arceneaux in the jury's presence, and they asked the court for a ruling. It was clear from defense counsel's argument that Defendant wanted Arceneaux questioned out of the jury's presence in order to prevent prejudice when the witness invoked the Fifth Amendment. We find that defense counsel's objection and request for a ruling were sufficient to satisfy the contemporaneous objection rule. See, State v. Berry, 94-249, pp. 4-5 (La.App. 5th Cir.10/25/94), 645 So.2d 757, 760.
Turning to Defendant's argument on the merits, that Arceneaux's assertion of his Fifth Amendment privilege in the jury's presence constitutes reversible error, we disagree.
The privilege against self-incrimination granted by the Fifth Amendment to the United States Constitution is also assured by Article I, § 16 of the Louisiana Constitution (1974), which provides that "No person shall be compelled to give evidence against himself." The jurisprudence favors the determination of claims of privilege outside the jury's presence, considering the undue weight a jury might give to such a claim. In State v. Wille, 559 So.2d 1321, 1337-1338 (La.1990), the Louisiana Supreme Court stated:
This court has recognized that it is error to allow the prosecutor to call before the jury a witness who he knows will invoke the privilege against self incrimination, when there is no other purpose for calling the witness except to have the jury draw evidentiary inferences from the fact that the witness claimed the privilege.
See also, State v. Berry, 324 So.2d 822, 830 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976); State v. Gerard, 96-366, pp. 11-12 (La.App. 5th Cir.11/14/96), 685 So.2d 253, 258.
In the leading case of Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the United States Supreme Court considered the question of whether the trial court committed reversible error in allowing prosecutors to question two witnesses about whether they engaged in criminal activity with the defendant, although it was known that the witnesses were going to claim their privilege against self-incrimination. The Court held that reversible error can occur either when "the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," Id. at 186, 83 S.Ct. at 1154-1155, or when "in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, *536 and thus unfairly prejudiced the defendant." Id. at 187, 83 S.Ct. at 1155.
This Court has employed the two-part Namet test in determining whether the trial court has committed reversible error in allowing a witness to invoke his Fifth Amendment privilege in the jury's presence. State v. Mills, 04-489, p. 6, (La.App. 5th Cir.3/29/05), 900 So.2d 953, 962, writ denied, 05-1470 (La.1/13/06), 920 So.2d 235; State v. Smith, 04-340, p. 8 (La.App. 5th Cir.10/26/04), 888 So.2d 280, 287.
In State v. Smith, supra, this Court, finding no reversible error, noted that the testifying witness, who was a co-defendant and had already been convicted of the crime, had no valid Fifth Amendment privilege to assert. Similarly, in this case, the Defendant had no valid Fifth Amendment privilege to assert and he was under court order to testify.
Applying the Namet analysis, we find nothing in the record to indicate the State made a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. To the contrary, it appears that the district attorney did not believe Arceneaux could assert the privilege and was of the view that he could be required to testify under La. C.Cr.P. art. 439.1. The entire matter was aired before the court and there is no evidence of prosecutorial misconduct. Second, we do not find that Arceneaux's assertion of his right not to testify added critical weight to the state's case in a form not subject to cross-examination or that it unfairly prejudiced the Defendant. The only question asked of Arceneaux before he asserted privilege was how old he was. It is difficult to conclude that his assertion of his Fifth Amendment privilege in response to that question prejudiced the Defendant. No further questions were asked and Arceneaux was excused. The trial judge ruled that Arceneaux could not be recalled, consistent with his earlier ruling that he would not allow the State to ask Arceneaux numerous questions, creating factual inferences, while the witness refused to answer.[5]
Defense counsel had advised the jury during opening argument that Arceneaux was the person who shot the victim and that he had been convicted of first degree murder. The State did not dispute that. Rather, it was the defense contention that Defendant, although present at the crime, was an innocent bystander. However, the Defendant's admission that he was with Arceneaux on the night and time of the crime and the victim's daughter's testimony that Defendant was not an innocent spectator but a participant, provided sufficient evidence of the Defendant's guilt. Therefore we find the assertion by Arceneaux of his Fifth Amendment privilege was not reversible error. This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error Defendant argues the trial court erred in denying his motion for new trial because Arceneaux's refusal to testify deprived him of his Sixth Amendment right of confrontation.
The Sixth Amendment to the United States Constitution allows an accused person in a criminal proceeding to confront any person who offers testimony against them. In this case, there was simply no testimony upon which to confront the witness.
*537 As discussed above, the prosecutor did not ask Arceneaux any substantive questions. He only asked the witness his age and then inquired whether he understood that he was required to testify. Immediately thereafter, Arceneaux was excused and not allowed to return as a witness. Accordingly, we find Arceneaux did not provide any information upon which the defense could have cross-examined him. Thus, for the reasons provided in Defendant's first assignment of error, as well as the fact that Arceneaux did not give testimony upon which he could be cross examined, we find no merit in the contention that the trial court erred in denying the defense motion for a new trial because the Defendant was denied his confrontation rights. This assignment of error lacks merit.
ERRORS PATENT DISCUSSION
The record was reviewed for errors patent. LA.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir. 1990). The review reveals the following:
La. R.S. 14:30.1 B requires that a sentence for second degree murder must be served at hard labor. The commitment indicates Defendant was sentenced to life imprisonment at hard labor. We note that in the transcript of the sentencing, the trial judge expressly stated that the sentence was mandatory as prescribed by law, but neglected to state that the sentence was to be served at "hard labor." If there were some discretion allowed by the applicable sentencing statute, such that some confusion arose over how the sentence was to be served, the failure to indicate whether the sentence was to be served at "hard labor" would be an impermissible indeterminate sentence. However, here, since Defendant was sentenced pursuant to La. R.S. 14:30.1, which requires a mandatory sentence of life imprisonment at hard labor, without the benefit of parole, probation or suspension, the sentence is determinate. The failure by the trial judge to state that the sentence be served at hard labor, where the commitment accurately reflects the sentence to be served, is not an error requiring corrective action. State v. Norman, 05-794, (La.App. 5th Cir.3/14/06), 926 So.2d 657.
Accordingly, we affirm Defendant's conviction for second degree murder and his sentence to life imprisonment, at hard labor, to be served without benefit of parole, probation or suspension of sentence.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] This appeal pertains only to Richard Laviolette.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] In its brief, the State indicates that the trial court did not sentence Arceneaux until September 29, 2004.
[4] La.C.Cr.P. art. 439.1 provides:

A. In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a grand jury of the state, at any proceeding before a court of this state, or in response to any subpoena by the attorney general or district attorney, the judicial district court of the district in which the proceeding is or may be held shall issue, in accordance with Subsection B of this article, upon the request of the attorney general together with the district attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in Subsection C of this article.
B. The attorney general together with the district attorney may request an order under Subsection A of this article when in his judgment
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self incrimination.
C. The witness may not refuse to comply with the order on the basis of his privilege against self incrimination, but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.
D. Whoever refuses to comply with an order as hereinabove provided shall be adjudged in contempt of court and punished as provided by law.
[5] See State v. Davis, 05-0987, (La.App. 5th Cir.5/9/06), 930 So.2d 1099, where the trial court did allow repeated questioning despite the witness' refusal to answer, and this Court found reversible error.