666 So.2d 716 (1995)
STATE of Louisiana
v.
Daniel CHAMBERS.
No. 95-KA-0898.
Court of Appeal of Louisiana, Fourth Circuit.
December 28, 1995.
*717 Harry F. Connick, District Attorney of Orleans Parish and Kim Madere Graham, Assistant District Attorney of Orleans Parish, New Orleans, for the State of Louisiana.
Barry J. Landry, Becnel, Landry & Becnel, LaPlace, for Defendant/Appellant.
Before SCHOTT, C.J., and ARMSTRONG and PLOTKIN, JJ.
PLOTKIN, Judge.
On May 12, 1994, Daniel Chambers was indicted by grand jury for the first degree murder of Harrell Clark Jr., and on September 12, the indictment was amended to charge Chambers with second degree murder.[1] Chambers pleaded not guilty to the original and amended charges. On September 12, 1994, Chambers was tried and convicted of second degree murder in violation of La.R.S. 14:30.1, and on October 6, he was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. Chambers appeals the conviction.
At trial, Michelle Buffington was called as the first witness. She initially testified that she had pleaded guilty in connection with certain aspects of the case and that she had entered into an agreement with the State to testify, but invoked her Fifth Amendment privilege to refuse to testify further. She was advised by the trial judge that, because she had been granted immunity for all crimes that arose out of the events of this case, she *718 had no Fifth Amendment right not to testify. Nevertheless, she refused to testify.
Robin Cohen, a news reporter for WVUE New Orleans, testified that she interviewed Chambers, Juarbe, and Mason at Central Lockup on April 4, 1994. Her videotaped interview with Chambers was played for the jury.[2]
Todd Bauer, an anchorman at WWL New Orleans, testified that he was driving to work on Canal Street in the early morning of April 1, 1994, when a young woman tried to flag down his car. He initially slowed but became suspicious and decided not to stop when he noticed a man, who was dressed in dark clothing, standing on the sidewalk in darkness. Bauer could not identify this man.
Officer Frank Oliver of the New Orleans Police Department testified that he was on patrol with his partner at approximately 4:10 a.m. on April 1, 1994, when they responded to the shooting of a cab driver in the 2300 block of Canal Street. He found a United Cab with its engine running parked at 2322 Canal Street, which vehicle contained a white male in the driver's seat who was bleeding from the back of his neck onto the floor of the cab.
Ray Gisclair and Willie Bonney, security officers employed by Lee Protection Services, testified that they were working at the Majik Mart on the corner of Canal and Galvez Streets in the early morning of April 1, 1994. Bonney testified that when they left the store he saw a small car, which was parked on the corner of Spinato Street, turn its lights off. Gisclair testified that when they left the store he heard an auto backfire or a gun shot. They both saw a United Cab parked in the 2300 block of Canal Street. Bonney saw a female and a male exit the cab and enter the back seat of the small car. After Gisclair and Bonney spoke with a newspaper delivery man, they approached the cab and saw blood on the driver. Gisclair testified that they then chased a dark colored car, which Bonney testified was the small car he observed earlier, the wrong way down Miro Street in Gisclair's Ford pickup truck, but were unable to catch this car. They both saw two black males in the front seat of the car. Neither could identify Chambers.
Harrell Clark III, the son of the victim, testified that his father was a United Cab driver in April 1994.
Detective Paul Schnyder of the St. John Parish Sheriff's Department testified that on April 3, 1994, he interviewed Michelle and Misty Buffington, who made photo identifications. He then contacted officers in the New Orleans Police Department Homicide Division and he participated in the arrest of Chambers. He testified that Chambers's mother gave him a sales receipt for a Smith & Wesson nine millimeter pistol, which was purchased by Chambers in Baton Rouge on February 25, 1994.
Sergeant Juan Watkins of the St. John Parish Sheriff's Department testified that he participated in the arrest of Chambers, Mason, and Juarbe. Chambers, Mason, and Juarbe were arrested at approximately 4 a.m. on April 4, 1994, when they stopped to get gas for a burgundy Nissan 200 SX.
Michael Nobile, a paramedic supervisor for the City of New Orleans, testified that on April 1, 1994, at approximately 4 a.m. he arrived at the scene of the shooting. The victim had a gunshot wound to the back of the head, was respiratory and cardiac unresponsive, and had lost approximately 2,500 cc of blood. Nobile was instructed by a physician not to resuscitate.
Dr. William Newman, a pathologist at LSU School of Medicine, testified that the victim had a single, fatal gunshot wound to the head behind the ear, which was fired from approximately 2 feet away.
Christina LaPointe testified that she knew Chambers, Mason, and Juarbe. She identified Chambers in court. LaPointe testified that in early April Michelle and Misty Buffington came to her house to cut and dye their hair.
Michael Buffington, father of Michelle and Misty, testified that on Easter Sunday he took his daughters to the St. John Parish *719 Sheriff's Department to give statements. He testified that the girls were arrested and that Michelle pleaded guilty in juvenile court. He testified that he instructed Michelle not to testify because he didn't understand some of her plea agreement.
Officer Millard Green of the New Orleans Police Department testified that he obtained five unidentified fingerprints from the cab.
It was stipulated that Detectives Demma and McCord of the New Orleans Police Department Homicide Division would testify that they took statements from Chambers, Mason, Juarbe, and Michelle and Misty Buffington.[3] Chambers's videotaped statement was played for the jury.
According to Chambers's videotaped statement, he met Mason and Juarbe in LaPlace in the evening before the murder. Before leaving for New Orleans, they picked up Michelle and Misty Buffington. In New Orleans, they parked on Canal Street and spent two or three hours in Bourbon Street bars. When on the way back to the car, Juarbe suggested robbing a cab driver, Chambers said he didn't want to rob anyone. They got into the car and drove along Canal Street, during which drive Juarbe formulated the plan to rob a cab driver. Juarbe parked the car, and he, with his shirt outside of his pants to conceal the gun in his pocket, exited the car with Misty. Juarbe and Misty entered the rear of a cab that she had flagged down. The cab drove away and Chambers drove following. After Chambers saw Juarbe shoot the cab driver in the back of the head, he parked and waited for Juarbe and Misty. Misty left the cab but returned to search for money, which she did not find. Chambers asked Juarbe why he shot the cab driver but could not remember Juarbe's reply.
Chambers would not let Misty back into the car because her hands were covered with blood; he started to drive away while she wiped her hands on the grass. At Mason's request, Chambers drove back to pick up Misty and Juarbe. Chambers got into the back seat to let Juarbe drive. Juarbe drove from the scene while a vehicle chased them. They drove back to LaPlace after convincing Juarbe not to return to the scene of the murder. During this drive, Chambers again asked Juarbe why he shot the cab driver, and Juarbe replied that he shot him because he saw his face and because he refused to drive down a dark street. At approximately 5:40 a.m., Juarbe dropped Chambers off at home. Chambers said he did not know where the others went after that.
Chambers said that Juarbe had given him the money to purchase the nine millimeter Smith & Wesson that was used in the murder. He said he bought the gun because someone was trying to kill Mason. Chambers said that Juarbe still had the gun when he dropped Chambers off at home. Chambers said the car, which was a dark burgundy Nissan, belonged to Juarbe. He said that he later asked Juarbe where the gun was, and that Juarbe responded that it was at his house.
A review for errors patent reveals none.
Appellant contends that the trial court erred in allowing into evidence his inculpatory videotaped statement. He argues that the State failed to show that the waiver of his Miranda rights was knowing and voluntary.
This Court described the State's burden of proving the admissibility of a defendant's statement in State v. Bell, 613 So.2d 744, 745-46 (La.App. 4th Cir.1993) (citations omitted), stating:
The State has the burden of proving that a statement given by a defendant was freely and voluntarily given, not the product of threats, promises, coercion, intimidation, or physical abuse. To establish the admissibility of a statement made by an accused person during custodial interrogation, the State must prove that the accused had been advised of his/her Miranda rights, and that he/she waived these rights prior to interrogation. The determination of a statement's admissibility is within a trial court's discretion, and it should not be disturbed unless it is not supported by the evidence.
*720 See also State v. Davis, 93-1623 (La. 5/23/94), 637 So.2d 1012, cert. denied, ___ U.S. ___, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994) and State v. McKinney, 93-1425 (La.App. 4th Cir. 5/17/94), 637 So.2d 1120.
At the suppression hearing, Detective Demma testified that on April 4, 1994 at the St. John Parish Sheriff's Department, he and Detective McCord advised appellant of the charge against him and of his rights: that he had the right to remain silent; that anything he said could be used against him; that he had the right to have an attorney present prior to being questioned; that if he could not afford an attorney, one would be appointed for him; and that he had the right to have an attorney present if he chose to make a statement. Detective Demma testified that appellant appeared to understand each of these rights; that he chose to waive them; that he agreed to make a statement that would be simultaneously video and audiotaped; and that no threats, force, coercion, or promises were made to induce the appellant to make the statement. Once the appellant agreed to make a statement, he was again advised on his rights on tape, and he waived these rights on tape.
Appellant concedes that he was advised of his rights, but contends that the State failed to prove that his waiver of these rights was knowing and voluntary. There is no evidence to suggest that this waiver was not knowing and voluntary. Appellant, however, contends that the trial judge improperly limited defense counsel's questioning of Detective Demma when counsel attempted to show that appellant did not knowingly waive his rights. A review of the suppression transcript shows that, for example, three objections were sustained concerning the order in which the defendants were videotaped because a clock appeared in each videotape, one objection was sustained as repetitive, and two were sustained as to form (of which one was allowed when rephrased and no effort was made to rephrase the other). Likewise a review of the remainder of the suppression transcript does not show any instances in which the trial judge improperly restricted defense counsel's questioning.
Appellant also contends that in order for his waiver to have been made intelligently, Detective Demma before questioning him should have advised him that he could be convicted of murder and that, if convicted, the District Attorney could seek the death penalty. Appellant cites no authority for this position. From the testimony at the suppression hearing, it is evident that appellant was advised of his rights, and there is nothing in the record to indicate that appellant did not understand these rights or that his waiver of them was unknowing or involuntary. The trial judge did not abuse his discretion in finding that the statement was admissible. This assignment of error has no merit.
In his second assignment of error, appellant contends that the trial judge erred by permitting the State to call Michelle Buffington to invoke her right against self-incrimination in the presence of the jury. Prior to Chambers's trial, Michelle had pleaded guilty in juvenile court to being an accessory after the fact to Clark's murder. This plea was made in connection with a June 2, 1994 agreement in which she promised to testify against Juarbe, Mason, Chambers, and her sister in exchange for the State's promise to nolle prosequi a charge of armed robbery against her. When Michelle failed to appear in August 1994 to testify against Mason, the State sought to revoke the plea agreement. On August 24, 1994, a status hearing was held at which it became apparent that Michelle was unwilling to testify against the others.
In Juarbe's trial, the trial judge ruled that the State could not call Michelle to the stand to invoke her privilege against self-incrimination and the trial judge refused to grant the State a continuance. On August 30, 1994, this Court in unpublished opinion 94-1715 granted the State's continuance but declined to exercise its supervisory jurisdiction over whether Michelle should testify. Because of this continuance, Chambers was the next to be tried.
On September 8, 1994, the State filed a motion to compel Michelle to testify at Chambers's trial. The motion to compel granted Michelle immunity for any robberies *721 committed between March 31 and April 1, and for the murder of Clark. The trial judge ruled that the State could compel Michelle to testify. The defense took supervisory writs from the trial judge's ruling, and the Louisiana Supreme Court ultimately denied the writ, stating "Construing the state's grant of immunity ... as being co-extensive with Code Criminal Procedure 439.1C, the application of Manuel and Buffington are denied."[4]
Michelle initially testified that she had pleaded guilty in relation to some aspects of the case. She then stated that she was not willing to testify and invoked her Fifth Amendment privilege. The trial judge informed her that because she had received immunity, she had no Fifth Amendment privilege, and that she could be held in contempt of court for refusing to testify. When Michelle still refused to testify, she was permitted to step down.
Appellant asserts that the trial judge committed reversible error by allowing the State to call Michelle to the stand when the State knew that she would invoke her privilege against self-incrimination before the jury. The jurisprudence has held: "It is improper conduct for either the prosecution or the defense knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim or privilege." State v. Berry, 324 So.2d 822, 830 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976); see also State v. Duhon, 332 So.2d 245, 247 (La. 1976). We do not believe, however, that this rule is to be applied mechanically or that it is not amenable to harmless error analysis.
The Louisiana Supreme Court applied Berry and Duhon to find that it was a fair response for a prosecutor during the penalty phase to call a witness who he knew would invoke a valid privilege after defense counsel improperly commented on the prosecution's failure to call that witness during the guilt determination phase, stating:
If the prosecutor knows a witness will claim a valid privilege not to testify, the prosecutor should not call the witness for the purpose of impressing upon the jury the fact of the claim of privilege. A similar prohibition is imposed on defense counsel. However, because of the legitimate concern when the prosecutor fails to call a witness who possibly has relevant information that the jury will be unaware of the reason for the failure, the defense counsel has a correlative obligation not to argue any evidentiary inference from the absence of the witness. Issues relating to a claim of privilege should be heard outside the presence of the jury whenever possible.
This court has recognized that it is error to allow the prosecutor to call before the jury a witness who he knows will invoke the privilege against self incrimination, when there is no other purpose for calling the witness except to have the jury draw evidentiary inferences from the fact that the witness claimed the privilege. There was another purpose, however, for calling the witness before the jury in this case.
. . . .
The prohibition against the prosecutor's calling before the jury a witness who he knows will assert a privilege not to testify is designed not only to prevent the jury from drawing improper inferences from the fact of the witness' claiming the privilege, but also to deter the prosecutor from using bad faith trial tactics. Here, the prosecutor acted in utmost good faith in this regard in the guilt phase, but was frustrated by counsel's improper comments on the absence of the witness and his urging the jury to draw inferences from the absence.
State v. Wille, 559 So.2d 1321, 1337-38 (La. 1990) (citations omitted).
We do not believe that the State in this case knowingly called Michelle Buffington to *722 the stand for the purpose of impressing upon the jury the fact of the claim of a valid privilege. Under the plea agreement, Michelle was obliged to testify. When she attempted to revoke this agreement, the State filed a motion to compel her testimony, granting immunity in accordance with La. C.Cr.P. art. 439.1. The trial judge placed Michelle on the stand and attempted to compel her testimony, even threatening her with imprisonment for contempt.[5] The trial judge's ruling that she must testify because she had no privilege against self-incrimination was not erroneous. This Court declined to intervene. Subsequently, the Louisiana Supreme Court also declined to act. Given the unusual circumstances of this case, in which the prosecution granted immunity and sought to compel testimony with the apparent imprimatur of this Court and of the Louisiana Supreme Court, we find no error in the trial judge's ruling allowing Michelle to take the stand.
At worst, Michelle's invocation of privilege before the jury could amount only to harmless error. See Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). In this case, as in Namet, the State did not attempt to build its case from inferences arising from the witness's invocation of privilege. See id. at 186-87, 83 S.Ct. at 1154-55. Moreover, any inference drawn by the jury from the invocation of privilege was cumulative with and overshadowed by appellant's own videotaped confession. Even if it were error to allow Michelle to testify, under the unusual circumstances of this case, it is harmless error because the evidence is conclusive beyond a reasonable doubt of the defendant's guilt. Accordingly, this assignment of error has no merit.
In his third assignment of error, appellant contends that the trial judge erred by allowing the State to bring his shackled codefendants into the courtroom for identification during the testimony of LaPointe. Appellant argues that he was prejudiced by this display because the jury could have inferred that he was guilty from his association with these shackled individuals. However, the transcript reveals that defense counsel failed to object at trial. Accordingly, he cannot now raise this issue on appeal. See La.C.Cr.P. art. 841; see also State v. Taylor, 91-2496, p. 5 (La.App. 4th Cir. 3/29/94), 635 So.2d 416, 420. We note that the contemporaneous objection rule applies even when the defendant himself appears in prison attire at his own trial. See, e.g., State v. Spellman, 562 So.2d 455, 456 (La.1990). This assignment of error is without merit.
In his last assignment of error, appellant contends that he was denied a fair trial because of the prosecutor's prejudicial remarks. He argues that the State attempted to obtain a guilty verdict on the basis of the actions of his codefendants and by inviting the jury to identify with the victim and the victim's family.
Regarding references to appellant's codefendants, we note that because of the nature of this case, in order to prove that appellant was guilty of second degree murder, the State had to prove that appellant was a principal with the requisite intent in the armed robbery that resulted in the murder. See La.R.S. 14:30.1A(2); see also State v. Pierre, 93-0893 (La. 2/3/94), 631 So.2d 427; State v. Spotville, 583 So.2d 602 (La.App. 4th Cir.), writ denied, 585 So.2d 577 (La.1991). If the State was to show that appellant was involved with the requisite intent in the armed robbery committed by Juarbe and Misty Buffington, it was necessary to discuss to some degree the actions of the participants in the robbery. Moreover, further discussion of the actions of the others was necessary for the State to rebut the defense's closing argument that appellant was not a principal to murder but rather was only an accessory after the fact. See La.C.Cr.P. art. 774.
Regarding the invitation to identify with the victim or the victim's family, the prosecutor stated the following in his closing argument:
Now, he's got a family and Harrel Clark has a family and you have a family. How *723 would you like for somebody to come into the bank with the intentions of robbing somebody with a getaway man sitting a block down the way, and somebody was killed, and then they tell you, "I didn't know nothing about it."
The defense objected, which objection was sustained, but the defense did not request either an admonition or a mistrial. Because neither an admonition nor a mistrial was requested by defense counsel, appellant cannot now complain of the error. See La. C.Cr.P. arts. 770 & cmt. (b), 771, 774; see also State v. Michel, 422 So.2d 1115, 1121 (La.1982). Furthermore, we do not find that the remarks made by the prosecutor were prejudicial. This assignment of error is without merit.
Accordingly, appellant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Also indicted were Robert Juarbe, Reginald Mason, and Misty Buffington. Trial of all codefendants was servered, and all were convicted of second degree murder. Juarbe's conviction and sentence were affirmed in unpublished opinion 95-0395.
[2] This videotape is neither available from the Criminal District Court nor the District Attorney's Office. The substance of the tape is not included in the trial transcript.
[3] This stipulation appears as a minute entry but not in the trial transcript.
[4] This Court, on September 13, 1994 in unpublished writ 94-1808, declined supervisory jurisdiction, stating "We refuse to interfere with the orderly process of trial." Because Juarbe's trial would begin on September 15, 1995, and because a motion in limine hearing would be held that morning regarding whether Michelle Buffington could be compelled to testify at that trial, defense counsel asked that the Louisiana Supreme Court delay judgment until after that time. On September 19, 1995, the Louisiana Supreme Court denied the writ.
[5] In fact, at the time of Chambers's trial, Michelle was already being held at the Youth Study Center for contempt of court. She was ultimately released after testifying in Juarbe's trial.