Judgment rendered December 17, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,617-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

DARIUS TYRESE PERSLEY                       Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 386,867

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPEALS AND                       Counsel for Appellant
WRIT SERVICE
By: Christopher A. Aberle

JAMES E. STEWART, SR.                       Counsel for Appellee
District Attorney

MARGARET E. RICHIE GASKINS
CHRISTOPHER BOWMAN
Assistant District Attorneys

* * * * *

Before STEPHENS, THOMPSON, and ELLENDER, JJ.

**STEPHENS, J.,**

This criminal appeal arises out of the First Judicial District Court, Parish of Caddo, State of Louisiana, the Honorable Chris Victory, Judge, presiding. The defendant, Darius T. Persley, and his co-defendant Quinton Peace, were indicted for the second degree murder of Chavez Parker. The two men were tried separately; Peace, who went to trial first, was convicted as charged of second degree murder. Peace's conviction was on appeal at the time of Persley's trial, and he also had pending charges in Texas. Persley was found guilty by a unanimous jury of second degree murder and sentenced to the mandatory term of life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.

Persley has appealed his conviction, urging error in the trial court's ruling allowing, over objection by defense counsel and Persley's co-defendant, the prosecution to call Peace as a witness when the State's attorney knew that Peace's conviction for the same offense was not yet final and that he would assert his Fifth Amendment rights on the stand.

### FACTS AND PROCEDURAL BACKGROUND

Persley was one of two people seen running away from a red car with its doors and trunk open in the complex parking lot of the Linwood Homes Apartments in the early morning hours of December 21, 2021, by Shreveport Police Department ("SPD") officers on patrol. After a brief pursuit and search, Persley and his female companion were apprehended and taken into custody. The deceased victim, Chavez Parker, was hanging out of the front passenger side of the red Chevrolet Impala. Persley was not armed, but he

had a pair of bloody socks in one of his hands.[1]  Peace, his co-defendant, was apprehended in Fort Worth, Texas, in January 2022.  On March 18, 2022, a Caddo Parish grand jury returned a true bill charging Persley and Peace with the second degree murder of Chavez Parker, a violation of La. R.S. 14:30.1.  Persley waived formal arraignment and pled not guilty to the charge on June 1, 2022.  Pursuant to an unopposed motion to sever filed by the State, on June 17, 2023, the trial court ordered that the trials of Persley and Peace be severed.  Peace was tried and convicted of second degree murder in November 2023, and his appeal was pending at the time of Persley's trial in February 2025.[2]

A unanimous jury found Persley guilty of second degree murder on February 13, 2025.  His motions for new trial and post-verdict judgment of acquittal were denied in open court on February 24, 2025, and Persley was sentenced to the mandatory term of life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.

### Testimony Adduced at Trial

Ashlynn Bergeaux testified that during the late hours of December 20 and early morning hours of December 21, 2021, she was "riding around" with Persley and Peace in Peace's SUV.  Ms. Bergeaux was not familiar with the area; she was in Shreveport from south Louisiana to visit Persley.  Ms. Bergeaux, who was intoxicated, fell asleep in the back seat of the vehicle, because they had been riding around for a long time.  She recalled that

---

[1] The socks were seized, bagged, and handed over to CSI officers upon their arrival at the scene.

[2] Peace's conviction was affirmed by this Court in *State v. Peace*, 56,374 (La. App. 2 Cir. 8/27/25), 418 So. 3d 1133.

Persley and Peace got out of the vehicle at some point to get some weed to smoke.

Surveillance camera footage[3] from Melara Avenue in Shreveport shows a person, later identified as the victim, Chavez Parker, approaching a parked vehicle, subsequently identified as his red Chevrolet Impala, at 4:33 a.m. on December 21, 2021. Parker got into the driver's seat of the Impala and backed it up into a driveway. By 4:37 a.m. he had finished moving his vehicle; video footage shows that Parker remained inside his car with the headlights on. At 4:49 a.m., a white Mitsubishi SUV subsequently identified as belonging to Peace approached Parker's Impala. Peace was driving the SUV, Persley was in the front passenger seat, and Ms. Bergeaux was in the back seat. By 4:57 a.m., the white SUV was parked approximately one house away from Parker's car.

At 4:58 a.m., the surveillance footage shows Persley exiting the front passenger side of the white SUV and getting into Parker's Impala. During his walk to Parker's vehicle, Persley was sending messages to Parker via Facebook Messenger to make it look as if he had not met up with Parker that morning. Video footage also shows Peace getting out of the driver's side of the white SUV at 4:58 a.m. approaching Parker's vehicle. Surveillance footage at 5:01 a.m. shows that both men were inside the Impala with the victim. Nine minutes later, at 5:10 a.m., both Persley and Peace got out of Parker's car and ran back to Peace's SUV. Both men got back into the white SUV. Ms. Bergeaux, who had been sleeping in the back seat of the white

---

[3] State's Exh. EE.

3

SUV, was awakened by the sound of gunshots. One minute later, the video footage shows Peace's vehicle gone from the scene.

Ms. Bergeaux testified that when Persley and Peace got back into Peace's SUV, she was confused and thought that Persley had been shot. They drove around for a short time. At 5:20 a.m. security camera footage shows Peace's white SUV returning to where Parker's red Impala was parked. The footage confirms that between the time that Peace's SUV left the scene at 5:11 a.m. and its return at 5:20 a.m., no other cars or persons approached the victim's vehicle. The white SUV stopped almost in front of Parker's red Impala. Peace got out of the driver's seat of the SUV and ran to the red Impala. While Persley and Ms. Bergeaux were sitting in the SUV, he told her that she had to drive. Ms. Bergeaux told Persley that she didn't want to because she had poor vision and seizures. Persley, who had a gun, said that he didn't know how to drive and to get in the front seat and drive or he would kill her. Ms. Bergeaux testified that she couldn't remember whether Persley had the gun pointed at her, but she remembered getting into the front seat, starting to shake, and not being able to reach the pedal. Surveillance footage shows Peace's white SUV being driven away from the scene in a jerky, hesitant manner.

At 5:22 a.m., video footage shows Peace driving Parker's red Impala away from the scene in the opposite direction. As Ms. Bergeaux drove, Persley directed her where to go. At 5:30 a.m., Persley sent another message to Parker via Facebook Messenger in an attempt to distance himself from the crime. Ms. Bergeaux recalled driving Persley to some apartments, where they saw Peace. She testified that she went upstairs into one of the units because she had to go to the bathroom. Ms. Bergeaux wanted to stay in the

4

apartment, but Peace and Persley told her she had to come downstairs with them. After she walked outside with Persley and Peace, they led her over to a car; she saw a dead body inside the car.

SPD Corporal Rodney Medlin and trainee SPD Officer Trevor Pinckley were patrolling the area of the Linwood Homes Apartments in the early morning hours of December 21, 2021. Cpl. Medlin[4] testified that he was driving the marked patrol unit with Ofc. Pinckley in the passenger seat. At 6:03 a.m., they observed a red Chevy Impala in the apartment complex parking lot with its trunk and all four doors open. The officers also saw a black male later identified as Persley and a white female later identified as Ms. Bergeaux standing near the Impala. When they noticed the police car, Persley and Ms. Bergeaux took off running. It was raining at the time, and Persley pushed Ms. Bergeaux "into the water" when they saw the police. Because she was cold and scared, Ms. Bergeaux ran into the laundry room of the complex and hid by the dryers.

Cpl. Medlin jumped out of the patrol unit and began pursuing Persley and Ms. Bergeaux on foot, while Ofc. Pinckley drove around to the other side of the building to cut the pair off from a potential escape route. Ofc. Pinckley apprehended Persley in front of the laundry room, and Cpl. Medlin found Ms. Bergeaux hiding behind a dryer in the laundry room. Both were taken into custody.

Persley did not have a weapon on him when he was detained, but Cpl. Medlin noticed that Persley was holding a pair of bloody socks in one hand.

---

[4] During his testimony, Cpl. Medlin discussed the crime scene diagram and photographs with the jury, which were entered into evidence as State's Exhs. B and C, respectively.

Cpl. Medlin put the socks in a paper bag and gave the bag to the SPD crime scene investigation ("CSI") unit officers at the scene. DNA analysis performed by forensic scientist Kari Dicken with the North Louisiana Criminalistics Laboratory in Shreveport established that the blood on the socks was a match for the victim's DNA.

After Ofc. Pinckley placed Persley in the back of the patrol car, he returned to the red Impala, where he observed the dead body of a heavyset black male, later identified as the victim, Chavez Parker, hanging out of the front passenger side door of the vehicle. Ofc. Pinckley also saw bloody napkins, Clorox wipes, and rags strewn throughout the car as if someone had been trying to clean evidence from it.

SPD Corporal Cody Walsworth performed the crime scene investigation in this case. From outside of the apartment complex near the Impala and foot chase with Persley, Cpl. Walsworth recovered a bottle of rubbing alcohol[5] and several items with what he suspected to be blood on them—a bottle of lotion, a spray bottle, and three tissues. Cpl. Walsworth testified that, from his experience as a crime scene investigator, he believed that the bloody tissues and alcohol were indications that someone had been attempting to clean or remove evidence from the Impala. He also recovered a black cloth ski/face mask from the Impala's windshield.[6] Subsequent DNA analysis performed by Ms. Dicken determined that Persley's DNA was consistent with DNA found on the mask. Ms. Dicken also found that it was the victim's blood on the socks recovered from Persley.[7]

---

[5] The rubbing alcohol container was entered into evidence as State's Exh. E.

[6] The ski mask was entered into evidence as State's Exh. D.

[7] The socks were entered into evidence as State's Exh. A.

6

The inside of the Impala, including the trunk, were cluttered with random objects. Swirl marks were on the front passenger window and there were clean spots on the otherwise dirty front passenger door, which appeared to Cpl. Walsworth to be from attempts to clean off or wipe down the window and door. On the front driver's side of the vehicle, blood flowed down the upper and lower parts of the seat and down the center console. Three spent cartridge casings were recovered from the Impala—one from the crevice between the upper and lower seat cushions of the front passenger seat, the second from inside the vehicle, and a third from the rear passenger compartment. Cpl. Walsworth explained photographs of the crime scene to the jury.[8]

Cpl. Walsworth also collected evidence from Units 250 and 292 of the Linwood Homes Apartments. Peace resided at apartment number 292, and his mother lived at apartment number 250. While officers did not find a 9mm weapon in either apartment, an empty 9mm ammo box was found in one bedroom of apt. 292, and a gun box for a SCCY CPX-1 9mm pistol with the Serial No. 936310 was found in the second bedroom of apt. 292. Cpl. Walsworth explained photographs of the searches to the jury.[9]

Dr. Long Jin, the forensic pathologist who performed Parker's autopsy, testified that multiple gunshots were the cause of his death.[10] There were four penetrating gunshot wounds. One bullet, State's Exh. O, entered Parker's head through his right temple; it was removed from his left

---

[8] These photos were entered into evidence as State's Exh. I.

[9] These photos were entered into evidence as State's Exh. J.

[10] Dr. Jin's autopsy report was entered into evidence as State's Exh. N; photos of the autopsy were entered into evidence as State's Exh. S.

temporal scalp. Dr. Jin stated that this bullet penetrated Parker's brain and was likely a fatal wound. A second bullet, State's Exh. P, entered the victim's body from the top of his right shoulder and was recovered from his right lateral chest. A third bullet, State's Exh. Q, entered Parker's right cheek and was recovered from his left maxillary sinus. The fourth bullet, State's Exh. R, entered the victim's neck on the right side and was recovered from the deep tissue on the left side of his neck. According to Dr. Jin, this was also likely a fatal bullet wound, as this projectile perforated Parker's spinal column very close to where it connects to the brain stem.

Persley's co-defendant, Peace, was arrested in Fort Worth, Texas, by Officer Robert McElyea of the Fort Worth Police Department ("FWPD"). When Peace was taken into custody by the FWPD, a 9mm SCCY model CPX-1 with Serial No. 936310 was seized after it was found inside the apartment in which Peace was arrested.[11]

Philip Stout, an expert in forensic firearms examination, testified that he examined the projectiles recovered from Parker's body and the 9mm pistol seized from Peace at the time of his arrest in Fort Worth. Stout determined that three out of the four projectiles recovered from the victim's body had been fired by the 9mm SCCY model CPX-1 pistol bearing Serial No. 936310—the projectiles admitted as State's Exhibits O, P, and Q, which corresponded to the bullet wounds to Parker's right temple, right shoulder, and right cheek. The fourth projectile, State's Exhibit R, which corresponded to the fatal wound in Parker's neck, could not have been fired by the pistol recovered in Fort Worth, according to Stout. However, the

_____

[11] An NLCL Weapon Report was entered into evidence as State's Exh. U, and an NLCL Certified Report was entered into evidence as State's Exh. V.

class characteristics of the rifling on the fourth projectile were consistent with the rifling marks made only by SCCY brand firearms. Therefore, the fourth bullet, opined Stout, was fired by a second weapon also manufactured by SCCY.

SPD Sergeant Monique Coleman testified that on the morning of December 21, 2021, after Persley was advised of and waived his *Miranda* rights, she interviewed him. During the interview, he was repeatedly untruthful. Persley claimed at first that he did not know Chavez Parker, but that he discovered Parker's body in the Linwood Homes Apartments parking lot and had been trying to render aid to the victim when the police apprehended him. When Persley did admit to knowing Parker and having been present at the scene of the crime, Persley identified Peace as the other person who was present. Persley told Sgt. Coleman that he was afraid of Peace, and that Peace had committed the murder. Persley stated that Peace had forced him to go back to the apartments. Persley repeatedly denied that he and Peace had attempted to rob Parker, who Persley claimed "didn't have anything on him."

Sgt. Coleman also testified about incriminating text messages between Persley and Peace and Facebook Messenger communications between Persley and Parker that SPD discovered during their investigation. Some of the messages were read aloud to the jury by Sgt. Coleman and transcripts were entered into evidence.[12]

---

[12] State's Exhs. AA, CC, and DD.

**DISCUSSION**

*Arguments of the Parties*

Persley's only assignment of error is that the trial court erred, when over the objection of Peace and Peace's counsel, the State was allowed to call Peace to testify, knowing that his conviction was not final and that he would assert his Fifth Amendment rights on the stand.

According to Persley, the ADA's attempt to use statutory immunity under the circumstances of this case was not proper because the State used Peace's hostility and his reliance on the Fifth Amendment to show the jury what an evil man Persley was associated with. Persley suggests that the State knew or should have known that Peace would not have cooperated. The calling of a witness to assert his Fifth Amendment protection in front of a jury is not permitted as a matter of law.

Appellate counsel urges that the animosity between the ADA and Peace was unfairly attached to Persley to intentionally prejudice the jury against him. The prosecutor, having been the ADA who tried Peace, already knew how the witness would behave before he took the stand. Peace's hostility became even more clear after the first question was asked. Furthermore, the idea of immunity was "insupportable" as Peace had already been convicted of the instant charge (although this conviction was not yet final) and had pending charges in another jurisdiction. For the State to claim that Louisiana authorities could "nullify" Peace's Fifth Amendment rights under these circumstances was indefensible. According to Persley, the State lacked good faith in its offering of Peace's testimony in this case. Its use of La. C. Cr. P. art. 439.1 immunity was not actually for the purpose of getting

testimony, urges Persley. Instead, it was for the improper purpose of getting Peace before the jury.

Persley also complains that the prosecutor in his rebuttal relied improperly on his exchange with Peace to emphasize how "horrific" Persley's co-defendant was. "The irrelevant fact that a man [the prosecutor] convicted was hostile became a cornerstone of the State's case against Mr. Persley."

Persley contends that he was entitled to a trial focused solely on the evidence, not one that turned into a sideshow involving Peace's disrespect and hostility for the ADA who prosecuted him. This turned Persley's trial into a matter of vindication for the prosecutor and created error that affected Persley's substantial rights to a fair trial under the U.S. and Louisiana Constitutions.

The State argues that Persley's assignment of error lacks merit because at the time of Persley's trial, the State had a good faith belief that the immunity granted to Peace was valid. Peace's attorney did not object on the grounds that his testimony could subject him to prosecution in Texas on state law charges; therefore, the State was not on notice that any alleged Texas charges might render the immunity granted insufficient to meet Fifth Amendment standards. Thus, the State attempted to compel Peace's testimony in this case "with the good faith belief that Peace would be unable to assert his Fifth Amendment rights on the stand, because [it] believed that those rights had been superseded by the immunity grant."

When a prosecutor reasonably believes that a witness cannot validly exercise his Fifth Amendment rights, reversible error is not committed if that witness "invalidly asserts" his Fifth Amendment rights in front of the jury.

11

In this case, the record shows that the prosecution had a good faith belief that the immunity granted to Peace was valid, and that he could not "justifiably" assert his Fifth Amendment rights in front of the jury.

The State acknowledges that the record shows that Peace already knew that the prosecutor disliked him and knew prior to calling him to the stand that Peace might be hostile. Nonetheless, the State has a right to call a witness known to be hostile or untruthful to test whether the witness will testify truthfully under oath and subject to the penalties of perjury and contempt. Peace had made statements after his arrest in Fort Worth that directly implicated Persley as his co-conspirator in the murder of Chavez Parker. The ADA put Peace on the stand as a witness to elicit those statements from him under oath.

Once on the stand, Peace stated his name and agreed that he was currently in Angola serving a sentence for second degree murder. The prosecutor's third question was, "Do you remember when you were arrested in 2022 for the murder of Chavez Parker?" This question was asked in an attempt to have Peace affirm or deny his prior statement under oath. Peace's reply was inconsistent with his prior statement. Instead, what he said was, "That man [Persley] did not kill anyone. If he did, I would not be serving a life sentence in Angola." Because this statement was directly contradictory to his prior statement to police, the prosecutor was within his rights in continuing to question Peace in front of the jury in an attempt to impeach Peace's credibility.

The State asserts that the fact that the prosecution only tried two tactics to impeach Peace's earlier testimony weighs heavily in favor of its good faith in this case. According to the State, if its purpose for calling

12

Peace to the stand had been to reflect poorly on Persley, it would have continued trying to impeach Peace in front of the jury notwithstanding the fact that he had mentioned his Fifth Amendment rights.

With the jury out of the courtroom, the prosecutor played portions of Peace's recorded interview with Fort Worth police to impeach his prior testimony that Persley did not kill Parker. After playing the video/audio recording, the ADA asked Peace whether the recording had refreshed his memory. Peace's response was to spout profanity at the prosecutor again. The ADA asked Peace two more questions about his prior statement and asked for three more contempt charges against Peace in response to his unresponsive, hostile answers. At that point the prosecutor declined to question Peace further, and defense counsel did not cross-examine Peace.

Regarding Persley's argument about improprieties in the prosecutor's closing argument, the State asserts that the ADA instead instructed the jury to disregard both Peace's testimony and his bad behavior. The State points out that the only testimony Peace gave before he got hostile was that he was currently in prison for Parker's murder, and that Persley did not kill Parker. Peace contradicted his prior statements to police to testify in Persley's favor. The prosecutor's discussion of Peace in his closing argument was on rebuttal and was an attempt to do damage control regarding Peace's untruthful testimony in Persley's favor, urges the State.

Finally, the State urges that if the trial court erred in allowing the State to call Peace as a witness or to continue questioning him in front of the jury, this constituted harmless error in light of the overwhelming evidence against Persley in this case. Because the verdict rendered in this case was surely

attributable to the abundance of other evidence against the defendant, the State urges this Court to affirm Persley's conviction.

*Analysis*

The privilege against self-incrimination granted by the U.S. Constitution's Fifth Amendment is also assured by Louisiana Constitution's Article I, § 16, which provides that "[n]o person shall be compelled to give evidence against himself." The Fifth Amendment privilege against self-incrimination extends to non-defendant witnesses, *Ohio v. Reiner*, 532 U.S. 17, 21, 121 S. Ct. 1252, 1254, 149 L.Ed.2d 158 (2001), who are not required to answer questions "where the answers might incriminate [them] in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S. Ct. 316, 322, 38 L. Ed. 2d 274 (1973).

It is improper conduct for either the prosecution or the defense to knowingly call a witness who will claim a privilege for the purpose of impressing on the jury the fact of the claim of the privilege. *State v. Duhon*, 332 So. 2d 245, 247 (La. 1976); *State v. Berry*, 324 So. 2d 822, 830 (La. 1975), *cert. denied*, 425 U.S. 954, 96 S. Ct. 1731, 48 L. Ed. 2d 198 (1976). Reversible error can occur when the prosecution makes a "conscious and flagrant" attempt to build its case out of inferences arising from use of the testimonial privilege or when inferences from a witness's refusal to answer adds critical weight to the prosecution's case in a form not subject to cross-examination. *Namet v. United States*, 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963); *State v. Laviolette*, 06-92, p. 14 (La. App. 5 Cir. 9/26/06), 943 So. 2d 527, 535, *writ denied*, 06-2585 (La. 5/18/07), 957 So. 2d 149.

The prohibition against the prosecutor's calling before the jury a witness who he knows will assert a privilege not to testify is designed not

only to prevent the jury from drawing improper inferences from the fact of the witness' claiming the privilege, but also to deter the prosecutor from using bad faith trial tactics. *State v. Wille*, 559 So. 2d 1321 (La. 1990), *cert. denied*, 506 U.S. 880, 113 S. Ct. 231, 121 L. Ed. 2d. 167 (1992). Claims of privilege are preferably determined outside the presence of the jury, since undue weight may be given by a jury to the claim of privilege and due to the impossibility of cross-examination as to its assertion. *State v. Duhon*, *supra*; *State v. Berry*, *supra*.

We first note that there is no merit to Persley's argument that the State took advantage of the ADA's unpleasant exchange with Peace to turn the trial into a sideshow involving Peace's disrespect and hatred for the ADA who prosecuted him. The record clearly refutes this contention. The prosecution's closing argument was made by an ADA who did not prosecute or engage with Peace; there was no reference to the State's failed attempt to elicit testimony from Peace in the closing of the prosecution. However, in *his* closing argument, ***defense counsel*** told the jury:

> [W]e had a lot of testimony from the stand, none more exciting than the testimony we got from Quinton Peace. He said a whole lot without saying a whole lot. But what was the first thing he said when he took the stand? He looked at my client, he looked at you'all, and he said, 'That man ain't killed nobody. If he did, I wouldn't be in prison.' And then the testimony got a lot more colorful, and we won't get into that. But a man who has admitted to killing someone, who has been convicted of killing someone, who has nothing to lose, why would he then put more on himself? Why would he do that? . . .
>
> In open court before the Lord and everybody, [Peace] told my colleague to eat a d*ck. Do you remember that? He even said F you. And I promised I wasn't going to get into that, because I thought it was extremely disrespectful, but that's what happened. But this is the guy that's the bully. This man right here (indicating) is the one that set all this up. This is the one that is responsible for the death of Mr. Parker.

15

Thereafter, the ADA who prosecuted Peace (and attempted to question Peace at Persley's trial) gave the rebuttal argument. ***This ADA's rebuttal*** included the following remarks:

> Now, let's talk about the testimony of Quinton Peace. I don't think he likes me that much, you know. I'm not on his Christmas card list. I don't care. Now, [defense counsel] would have you believe that means [his] client is innocent. What did [Peace] do more? Curse at me? Call me names? Or declare [defense counsel's] client's innocence?

> His motivation, our journey, me and Mr. Peace, our journey is done. Whatever I did or did not do to him, it's over at this point. His motivation had nothing to do with the search for truth. His motivation was his hatred of me. . . . [Peace] knew exactly who I was, and he was calling me by name. He had an axe to grind with me. Motivation to lie.

Clearly, the defendant cannot be allowed to take advantage of his co-defendant's favorable statement, then cry "foul" that the prosecution had to do damage control in its rebuttal.

However, there is merit to Persley's claim that the State (and the trial court) did not handle this situation properly. The State knew that Peace's appeal was pending before this Court—it was a party thereto. Furthermore, the State knew or should have known that Peace had pending charges in Texas—he was arrested and brought back from Fort Worth to stand trial in Shreveport. The immunity agreement was invalid on its face and thus of questionable value to Peace, who understandably was reluctant to testify and subject himself to further criminal liability.

The jury in this case should not have been exposed to ***any*** of the drama between the ADA and Peace, and the trial judge erred in allowing it to take place in his courtroom. At the very least, there first should have been a "run through" of the questions the ADA would ask to gauge how Peace would respond held ***out of the jury's presence***, since this same ADA had

16

only months before prosecuted and convicted Peace of the second degree murder of the victim that Persley was on trial for killing. However, there is no excuse for the trial court to have allowed the prosecutor to continue following Peace's first hostile outburst.

This situation went off the rails from the start when Peace made a claim, favorable to Persley, contradictory to what Peace had told Fort Worth police after his arrest. The prosecutor knew it and should have immediately asked the trial court for a sidebar. The profanity and disrespect from Peace, the ADA's request for numerous contempt charges in response, and Peace's invocation of his Fifth Amendment privileges were unnecessary and should not have happened while Persley was on trial.[13]

However, any errors committed by the trial court **and the State** regarding Peace and his Fifth Amendment rights against self-incrimination are harmless. These missteps were overshadowed by all of the other evidence and testimony that was introduced at trial regarding Persley's guilt, such as the text messages between Persley and Peace, Facebook Messenger communications between Persley and the victim, shell casings from two firearms establishing that there were two kill shots from weapons fired by two shooters, security camera footage from Melara Avenue near the victim's home and also from the Linwood Homes Apartment complex where the victim's car was taken, bloody socks with the victim's blood on them found in Persley's hands when he was apprehended, the black ski mask containing

---

[13] We agree with appellate counsel that the trial court should not have forced, at the ADA's request, defense counsel to waive, in the jury's presence, his right to cross-examine Peace. Persley's counsel obviously had tactical reasons for not wanting to do so, and it is neither the State nor the trial court's bailiwick to second-guess such a decision, particularly when the witness is a recently convicted co-defendant who has acted **in front of the jury of counsel's client** in the manner that Peace did.

Persley's DNA recovered from the red Impala, testimony of police regarding Persley's statement, and the weapon recovered from Peace upon his arrest in Texas which forensics experts matched to three of the four projectiles recovered from the victim's body.[14]  We reiterate that Peace's testimony was self-incriminating and exculpatory of Persley, vitiating any harm it may have caused.

There is no merit to the defendant's assignment of error.

## CONCLUSION

For the reasons set forth above, the conviction and sentence of the defendant, Darius T. Persley, are affirmed.

**AFFIRMED.**

---

[14] See, *Namet v. United States*, *supra*; *State v. Chairs*, 12-363, p. 17 (La. App. 5 Cir. 12/27/12), 106 So. 3d 1232, 1244, *writ denied*, 13-0306 (La. 6/21/13), 118 So. 3d 413; *State v. Chambers*, 95-0898, p. 11 (La. App. 4 Cir. 12/28/95), 666 So. 2d 716, 722, *writ denied*, 96-1699 (La. 7/30/97), 697 So. 2d 593.